# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| MELVIN ERVIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 00-BU-77-E |
| | ) | |
| THE CITY OF LINEVILLE, ALABAMA, a municipal corporation; and POLICE CHIEF MONTY GIDDENS, in his individual capacity, | ) ) ) ) ) | **ENTERED** DEC 1 3 2000 |
| | ) | |
| Defendants. | ) | |

## Memorandum Opinion

In the above-styled action, Plaintiff Melvin Ervin brings claims against his former employer, the City of Lineville, Alabama, (the "City"), and its police chief, "Monty" Giddens (sometimes hereinafter referred to collectively as "Defendants"), based on allegations that they subjected Plaintiff to racial discrimination by, inter alia, terminating his employment. Plaintiff contends that the City and Giddens are each liable under 42 U.S.C. § 1983 ("section 1983") because such discrimination violated his rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment. Plaintiff has also asserted claims against the City under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Now before the Court is Defendants' motion for summary

judgment on all remaining claims,[1] filed October 24, 2000. (Doc. No. 59). Also pending is a motion filed October 27, 2000, by Plaintiff to strike the affidavit of a Drug Enforcement Administration ("DEA") agent, Randall Sanders, which Defendants offered in support of their summary judgment motion. (Doc. No. 62). Finally, Plaintiff filed a motion on November 6, 2000, seeking sanctions against Defendants (Doc. No. 67), for allegedly violating the federal rules of civil procedure governing discovery by failing to disclose Sanders as a potential witness and by failing to produce handwritten notes prepared by Giddens concerning a telephone call he received from Sanders.   The foregoing motions are now ripe for decision. Based on the evidence and arguments of the parties, the Court concludes: Plaintiff's motion to strike the affidavit of Randall Sanders is due to be DENIED; Plaintiff's motion for sanctions is due to be DENIED; and Defendants' motion for summary judgment is due to be GRANTED.

## I. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it

---

[1]By prior order, the Court dismissed with prejudice Plaintiff's claims against Giddens in his official capacity, see Doc. No. 23, as well as Plaintiff's section 1983 claim in Count III of his amended complaint alleging that the termination of his employment violated the Due Process Clause of the Fourteenth Amendment, see Doc. No. 31.

believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299).

## II. BACKGROUND[2]

On or about November 10, 1998, Plaintiff began working as a police officer for the City, after being hired by the Lineville City Council, upon Chief Giddens recommendation. Plaintiff was at that time the only African-American on the City's six-member police force. He was, however, considered a "probationary" employee under the City's employment policy, which provides in pertinent part as follows:

New employees will serve a minimum six (6) month probationary

---

[2]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

period. Upon recommendation of the supervisor, the probationary period may be extended for an additional maximum of six (6) months. Probationary employees, like all other employees, may be terminated during the probationary period for any reason. During the probationary period, the employee's work habits, abilities, attitude, promptness and other pertinent characteristics will be observed and evaluated by a supervisor, department head and other appropriate officials. At the end of the probationary period, the supervisor will submit an Employee Progress Report, along with his recommendation, to the Mayor and [City] Council. If approved, the employee's status will be made permanent and he will be given a step raise.

City of Lineville Policy and Procedure Manual § 4.

In addition, Plaintiff had yet to be certified by the Alabama Peace Officers' Standards and Training Commission ("APOSTC") as having completed the required course of police academy training. See § 36-21-46(a)(3), Ala. Code (1999 Cum. Supp.). Prior to becoming employed by the City, Plaintiff had enrolled in but failed to complete the training program at the Northeast Alabama Police Academy. At that time, Plaintiff was employed as a police officer by the City of Lincoln, Alabama ("Lincoln"), which had hired him in July 1997 and nominated him for the academy class running from September 1, 1997 to November 21, 1997. While Plaintiff began the training at the academy, he was permitted to withdraw for medical reasons on September 4, 1997, after a doctor verified that Plaintiff had severely sprained his ankle during a failed attempt to pass a required physical agility test.

Because Plaintiff had never been certified by APOSTC, he was restricted by state law with respect to the law enforcement duties he could perform for the City without being under the direct supervision of a certified officer. See Ala. Admin. Code r. 650-X-2-.01 (9/30/2000 Supp.) Alabama law also provides that while a law enforcement agency may appoint an uncertified individual to work as a police officer, such appointment is provisional, remaining in effect for only six months. Section 36-21-46(a)(3), Ala. Code.

After the six months have expired, the individual may not be employed as a law enforcement officer for an additional period until he is certified by APOSTC. Id.

In order that Plaintiff might become certified, the City enrolled him in the Montgomery Police Academy for the 12-week session beginning December 14, 1998. However, Plaintiff again failed to complete the required training. While attempting to pass the physical agility test, Plaintiff aggravated the ankle injury he sustained at the Northeast Alabama Police Academy in September 1997. He again reported to a hospital, where he was given pain medication and put on crutches. Because the injury would keep Plaintiff from attempting to pass the required physical ability tests, the City withdrew Plaintiff from the program on December 16, 1998. Thereafter, the City nominated Plaintiff for the next session of the Montgomery Police Academy, scheduled to begin May 3, 1999 and graduate July 23, 1999. APOSTC deemed Plaintiff eligible, and he was registered for that session. In the meantime, Plaintiff returned to Lineville and took a couple of days off of work. Thereafter, he resumed his policing duties, though he was still uncertified.

Shortly after he returned to work, around the beginning of the new year, 1999, Plaintiff began to believe that Giddens was treating him less favorably than white officers. Plaintiff noticed in January that, after one of the regular radio dispatchers went on leave, Giddens made Plaintiff assume dispatcher duties more often than the two white uncertified officers on the force, Tony Knight and Derrick Forbes. Plaintiff was thus more often denied, and the white officers were more often granted, preferable patrol duty. Giddens also allegedly made comments impugning both Plaintiff's suggestions for improving policing and Plaintiff's abilities. Other times, Giddens would simply ignore Plaintiff. Plaintiff believed that such conduct was racially motivated because Giddens allegedly did not act similarly towards white officers.

Plaintiff also contends that Giddens would verbally reprimand him unfairly and

based on race. On one occasion in February 1999, Giddens instructed Plaintiff and a few other officers to work security at a high school basketball game. At halftime, Plaintiff left the gymnasium and went to the local municipal courthouse to check on some of his cases that were pending on the docket. When Plaintiff walked in the courtroom, however, Giddens was there. He asked Plaintiff why he had left the game before it was over without authorization, and he upbraided Plaintiff in front of the judge and numerous other members of the public present in the courtroom. Plaintiff contends that other officers had left similar assignments without being disciplined. Plaintiff claims that Giddens also verbally reprimanded him for coming into work before the start of his scheduled shift. On April 1, 1999, Plaintiff came into work several hours early because he could not sleep. He went riding on patrol with a certified officer, John Siggers, but about an hour later they were ordered to return to the station. Once there, Plaintiff was directed into Giddens's office, where Giddens asked Plaintiff why he was working at that time. Plaintiff replied that he was not trying to get any overtime and that he simply was having trouble sleeping, but Giddens told him that he had to leave and could not work before the start of his scheduled shift. When Plaintiff inquired as to why it was a problem, the city clerk, Mark Griffin, who was also present at the meeting, explained to Plaintiff that he was not covered by any insurance when he was not scheduled to work. Plaintiff contends, however, that white officers had come in to work before the start of their shifts without being told to leave or being otherwise reprimanded.

In late March 1999, Giddens received a telephone call from Randall Sanders, a DEA agent in Birmingham. Giddens asserted at his deposition that Sanders told him that he had information from a "proven, reliable, confidential informant" that a Lineville police officer named "Ervin" was extorting money from drug dealers. Giddens did not further investigate this tip because, he claims, Sanders had given him all the information he felt could be disclosed without compromising the safety of the people involved. Without

being able to question the informants, Giddens stated, he did not believe he was capable of conducting an investigation. Giddens also admitted that he did not confront or question Plaintiff about the allegations, because Sanders' indicated to Giddens that he might be able to follow up on the allegations, and Giddens believed he would spoil any such investigation if he started his own probe. Thus, while Giddens did not have any other proof to verify Sanders's information, he did report the allegations to the Mayor.

On the morning of April 9, 1999, approximately five months after Plaintiff's hire by the City, he was called into a meeting in the mayor's chambers at the Lineville City Hall with Giddens, Griffin, and a member of the city council. Giddens stated to Plaintiff that his employment with the police department was being terminated. The record indicates that the Mayor and the city council of Lineville had previously decided, without objection and upon Giddens's's recommendation, to terminate Plaintiff's employment with the City. When Plaintiff asked why he was being fired, Giddens told him only that the action was being taken "in the best interest of the City." Dissatisfied, Plaintiff asked for a more specific reason, but none was forthcoming. Plaintiff also attended a city council meeting the following Monday to ask that body why it had decided to fire him. However, the city council members and the Mayor merely repeated Giddens's vague explanation that it was done "in the best interest of the City."

Shortly afterward that same month, April 1999, Officer Siggers voluntarily resigned his employment with the City. In May or June 1999, the City hired a white male, Shane Lovvorn, to work as a police officer. Lovvorn, like Siggers, was certified by APOSTC. In September 1999, the City hired another officer, Cassandra Wood, an African-American female who, like Plaintiff, was uncertified.

After filing a charge of discrimination with the EEOC, Plaintiff filed this action

against the City and Giddens. In his complaint,[3] Plaintiff alleges in Count I that the City is liable under Title VII for subjecting him to disparate treatment in the terms and conditions of his employment, based on allegations that Giddens discriminated against him because of race by verbally reprimanding him for coming into work before the start of his shift and for leaving his assignment at the girls' basketball game. In Count II, Plaintiff claims the City is also liable under Title VII for terminating his employment on the basis of race. Count III asserts that the City is liable under section 1983 because the termination of his employment violates the Due Process Clause of the Fourteenth Amendment. In Count IV, Plaintiff contends that the City is liable for race discrimination under section 1983 for violating the Equal Protection Clause of the Fourteenth Amendment, based on the verbal reprimands, disparate assignments concerning radio dispatcher duties, and his termination. And finally, Plaintiff asserts in Count V that, based on the same facts underlying his claims against the City, Giddens is also liable, in both his individual and official capacities, under section 1983 for violating the Equal Protection Clause.

The Court has dismissed both the due process claim in Count III and the claim in Count V to the extent it sought to recover against Giddens in his official capacity. Defendants have now filed a motion for summary judgment on all remaining claims. Plaintiff has also filed a motion urging that the Court exclude from consideration an affidavit sworn by Sanders, wherein he confirms that he received information from an informant, who he considered reliable, implicating Plaintiff in extortion of money from drug dealers and that he told Giddens about such information. And finally, Plaintiff moves that the Court sanction Defendants for failing timely to disclose Sanders as a

---

[3]Plaintiff has actually filed an original and an amended complaint. However, because the amended complaint supersedes the original, see Fritz v. Standard Sec. Life Ins. Co. of New York, 676 F.2d 1356, 1358 (11th Cir. 1982), the Court here discusses the allegations of only the amended complaint. Any references to the "complaint" are to that pleading.

potential witness and for failing to produce handwritten notes made by Giddens, which memorialized his conversation with Sanders. The Court now turns to address these motions.

### III.  CONTENTIONS & ANALYSIS

### A. MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges that Defendants discriminated against him on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment.[4] Plaintiff seeks to recover for such violation against both the City and Giddens, in his individual capacity, pursuant to section 1983. That statute provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Based on the same facts, Plaintiff contends that the City is also liable for race discrimination under Title VII, which makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where, as here, a plaintiff alleges section-1983-equal-protection and Title VII-disparate-treatment claims as parallel causes of action alleging that his employer intentionally discriminated against him on the basis of race, the analytical framework and elements to be proven are the same for both types of claim. See Cross v. State of Ala., State Dept. of Mental Health & Mental Retardation, 49 F.3d 1490, 1507-08 (11th Cir. 1995); Busby v.

---

[4]The Fourteenth Amendment provides in relevant part, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.

City of Orlando, 931 F.2d 764, 777 (11ᵗʰ Cir. 1991); Lee v. Conecuh County Bd. of Educ., 634 F.2d 959, 962 (5ᵗʰ Cir. Jan. 1981).[5] Thus, the Court will discuss Defendants' motion for summary judgment on Plaintiff's Title VII and equal protection claims with a single analysis.

Plaintiff will bear the burden at trial of proving that Defendants discriminated against him unlawfully. See Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1082-83 (11ᵗʰ Cir. 1996). He may do so through either direct or circumstantial evidence. E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11ᵗʰ Cir. 2000). Plaintiff claims that he has both types of evidence. It is important, however, to determine whether Plaintiff has, in fact, presented direct evidence, because the analytical framework and burden of production varies depending on the method of proof chosen. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11ᵗʰ Cir. 1998). Further, if the plaintiff presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the defendant presents conflicting evidence. See Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11ᵗʰ Cir. 1997). Thus, the Court must first determine whether Plaintiff has presented direct evidence that employment actions taken against him were the product of discriminatory intent, as he claims.

### 1. Direct Evidence

The United States Court of Appeals for the Eleventh Circuit has attempted to define what constitutes "direct evidence" in a variety of ways, which are not always entirely clear or consistent. See Wright v. Southland Corp., 187 F.3d 1287 (11ᵗʰ Cir. 1999). However, what is certain is that not all evidence that might suggest racial bias is considered "direct evidence" for purposes of proving a prima facie case of discrimination.

---

[5]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11ᵗʰ Cir. 1981) (en banc).

The Eleventh Circuit has often stated that "direct evidence" is, rather, evidence, which if believed, "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11ᵗʰ Cir. 1998) (citing Carter v. City of Miami, 870 F.2d 578, 580-81 (11ᵗʰ Cir. 1989)); see also Hinson v. Clinch County, Georgia Bd. of Ed., ___ F.3d ___, ___, 2000 WL 1587655 (11ᵗʰ Cir. 2000). It has further explained that "direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11ᵗʰ Cir. 1990)). "Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." Standard, supra (citing E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 924 (11ᵗʰ Cir. 1990)). By whatever standard enunciated by the Eleventh Circuit, however, it is clear that Plaintiff has not produced direct evidence in this case.

Plaintiff's cites two pieces of evidence that he claims directly prove unlawful discriminatory intent. First, he cites Chief Giddens's acknowledgment in his deposition that he has used a racial slur. Giddens, who recommended to the city counsel that Plaintiff's employment with the police department be terminated, testified as follows:

    Q.    Have you ever used a racial slur?

    A.    Ever used one?

    Q.    Yes, sir.

    A.    Yes, ma'am.

    Q.    Have you ever used it in the context where you might not be repeating what someone else has said? Let me rephrase it so you'll have a better chance to explain. In what context might you have used a racial slur?

A.    I have said it joking around.

Q.    What have you said?

A.    The one I can recall, myself and James Bailey was at a narcotics officers' convention.  And we called down to a bar, and he wanted me to see if they would let n*****s come in.

Q.    When was this?

A.    This has been probably seven or eight years ago.

Q.    Have you used racial slurs since you have been chief of police of the City of Lineville?

A.    Not that I know of.

Q.    Since you have been chief of police of the City of Lineville, have you ever told a racist or a racial joke?

A.    Not that I know of.  No.

Giddens Depo. at 98-100.

Giddens testimony on this point is not direct evidence that any employment action was taken against Plaintiff on the basis of race.  Of course, a decisionmaker's use of racial slurs in certain contexts may constitute direct evidence of discrimination.  See, e.g., E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1072 (11th Cir. 1990) (overwhelming amount of evidence of racial hostility, including barrage of racial slurs, was direct evidence); ); Wilson v. City of Aliceville, 779 F.2d 631, 633, 636 (11th Cir. 1986) (holding that mayor's statement that "he wasn't gonna let no Federal government make him hire no god-dam n*****" constitutes direct evidence); Miles v. M.N.C. Corp., 750 F.2d 867, 876 (11th Cir. 1985) (statement by plant manager that he wouldn't hire blacks because "half of them weren't worth a shit" was direct evidence).  However, the evidence here indicates that Giddens used the term once; at a very remote time and place; not in

reference to Plaintiff or to employment matters; and with potentially questionable sincerity.[6] Given the clear lack of relation between the use of the epithet and Plaintiff or employment issues, it might be reasonably believed that Giddens uttered the epithet and yet did not discriminate against Plaintiff in his employment on the basis of race. Accordingly, the Court concludes that Giddens' deposition testimony does not constitute direct evidence of discriminatory intent with respect to any employment action regarding Plaintiff. See Allen v. City of Athens, 937 F.Supp. 1531, 1543 (N.D. Ala. 1996) (decisionmaker's deposition testimony that he had told racial jokes and used the "N" word within the past ten years and had told racial jokes within the last year failed to qualify as direct evidence because of its lack of relation to his decision not to hire the plaintiff).

Plaintiff also cites as direct evidence a statement made by Walter Kidd, an African-American formerly employed by the City as a police officer. Kidd alleges that he was passed over for a promotion to be the Lineville Chief of Police when the job became available in 1997 or 1998. Kidd further alleges that some members of the city council had then stated that "they didn't think the City of Lineville was ready for a black chief of police at that particular time." Kidd Depo. at 11-12. Plaintiff argues that this statement proves directly that the city council had a racial bias and discriminated against him in voting to terminate his employment.

Defendants argue, however, that Kidd's statement is inadmissible. They emphasize

---

[6]Defendants have alleged that James Bailey, the person Giddens referred to in connection with the time he recalled using the slur, is African-American and a friend of Giddens. This would lend further support to Giddens's claim that he was on that occasion using the term in a "joking" or ironic manner, rather than as a genuine expression of disdain for African-Americans. However, the portion of the record cited by Defendants is not entirely clear with respect to Bailey's race or how friendly he was with Giddens. Regardless, Gidden's use of the epithet is far too remote in time, place, and relevance to Plaintiff's employment to be considered direct evidence of discriminatory intent.

that when asked specifically who made the statement that the City was not ready for a black chief, Kidd stated: "This was more or less some people that was out on the street that were talking to me about this. They didn't give out any direct names. They just said some of the city councilmen. These people are very close to the members of the city council." Kidd Depo. at 16. Defendants contend that this shows that Kidd's statement is hearsay, is not based on personal knowledge, and cannot be considered on summary judgment. The Court agrees.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is generally inadmissible, Fed. R. Evid. 802, and, to the extent that it is, it cannot be considered on a motion for summary judgment. See Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999). Rule 56(e) of the Federal Rules of Civil Procedure requires that "affidavits" that support or oppose summary judgment motions "shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." This rule also applies to testimony given on deposition. Macuba, supra.

Even assuming that a city council member's statement, that the city was not ready for a black police chief, would be direct evidence of discrimination with respect to the city council's decision to terminate Plaintiff, which is questionable,[7] Kidd's statement cannot be considered by the Court. Plaintiff is offering Kidd's statement to prove the truth of the matter asserted to him by some unnamed third persons, i.e., that a city council member or members made the racial statement in question. Thus, his statement is

_____

[7]Such a statement would be direct evidence of discriminatory intent regarding a city council decision not to hire Kidd for the police chief position. However, there is a significant inferential gap between a statement indicating the belief that the City was not then "ready" for an African-American to assume the highest and most visible position of municipal police authority and the conclusion that the same person or persons discriminated on the basis of race in a subsequent decision regarding whether to retain Plaintiff, a probationary employee in a lower position of authority.

hearsay. See Fed. R. Evid. 801. Plaintiff does not argue that Kidd's statement is excluded from the definition of hearsay, see Fed. R. Civ. P. 801(d), or that it meets any hearsay exception, see Fed. R. Evid. 803. Kidd also lacks personal knowledge that any city council member made the statement, as required by Fed. R. Civ. P. 56(e). Instead, his knowledge is founded entirely on what he was told by others. The Court concludes, therefore, that Kidd's statement is inadmissible and cannot be considered on summary judgment. Macuba, supra. Its inadmissibility, of course, precludes it from being considered direct evidence of discrimination. See, e.g., Baron v. City of Highland Park, 195 F.3d 333, 339 (7th Cir. 1999).

### 2. Circumstantial Evidence

Plaintiff alternately contends that he might prove his claims of intentional race discrimination using circumstantial evidence. When a plaintiff offers circumstantial evidence to prove a disparate treatment claim, courts use the analytical framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). Under this framework, the plaintiff must first establish a prima facie case, which creates a presumption that the defendant engaged in unlawful discrimination with regard to the plaintiff. The employer must then produce sufficient evidence to indicate that it took the employment action in question for one or more legitimate, nondiscriminatory reasons. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are merely a pretext for unlawful discrimination. See McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-256. "Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves, 120 S.Ct. at 2106 (quoting

Burdine, 450 U.S. at 253).

### a. Termination Claims

Defendant argues that Plaintiff does not have circumstantial evidence sufficient to establish a prima facie case with respect to his Title VII and equal protection claims alleging that he was terminated because of his race. A prima facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . ." O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996) (quoting Teamsters v. United States, 431 U.S. 324, 358 (1977)). A plaintiff may prove a prima facie case of racially discriminatory discharge by showing: (1) he is African-American, (2) he was qualified for the position held, (3) he was discharged and (4) replaced by a person of a different race. See, e.g., Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1290 (11th Cir. 1998). A plaintiff may also satisfy the fourth element by showing his employer treated a similarly situated employee of another race more favorably. See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). See also Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185-87 (11th Cir. 1984) (explaining that a plaintiff need not necessarily show he was replaced by a member of another race in order to prevail on a claim of racially discriminatory discharge). Defendants admit that Plaintiff is African-American and that his employment was terminated. They claim, however, that he was not qualified to remain in his job, that he was replaced by another African-American, and that no similarly situated white employee was treated more favorably.

The Court will assume that Plaintiff can make out a prima facie case on his termination claims, and the Court will proceed to the second stage of the McDonnell Douglas analysis. See, e.g., Bogle v. Orange County Bd. of County Com'rs, 162 F.3d 653, 657 & n.3 (11th Cir. 1998) (assuming a prima facie case). At that point, Defendants must produce admissible evidence articulating one or more race-neutral reasons for terminating

Plaintiff's employment. " '[T]he defendant's explanation of its legitimate reasons must be clear and reasonably specific' so that 'the plaintiff be afforded a full and fair opportunity to demonstrate pretext.' " Chapman v. AI Transport, 229 F.3d 1012, 1034, (11th Cir. 2000) (en banc) (quoting Burdine, 450 U.S. at 258).

The record indicates that those involved in the decision to terminate Plaintiff were Giddens and the mayor and city council of Lineville, with the latter two simply acting on Giddens's recommendation. In their interrogatory responses, Defendants indicate that Plaintiff was fired because, among other reasons, Giddens was informed that Plaintiff would not be able to re-enter the police academy, and thus could not obtain certification. At his deposition, Giddens explained that he recommended to the mayor and city council that Plaintiff, as a probationary employee, should be terminated based on an accumulation of rule and procedure violations he perceived as showing deficiencies in Plaintiff's attitude and performance as a police officer.  Giddens cited several examples of things he recalled as being indicative of such deficiencies:  putting more time on his time cards than he actually worked; romantically associating in uniform with a woman who was not yet divorced, after the woman's husband complained; problems with his paperwork, such as failing to swear to complaints within a reasonable time and failing to fill out various required forms and activity sheets; leaving his assigned duty at the basketball game in February 1999; coming into work four hours before the start of his scheduled shift in early April 1999 and then becoming upset after he was told he could not do that; taking down a "door walking schedule"[8] posted by Giddens and replacing it with his own because, as he told Giddens, "his was better"; and forgetting to deliver a death notice. Another factor included in  Giddens's recommendation, he claims, related to the call he received in late March 1999 from Randall Sanders, in which Sanders told Giddens that an

---

[8]"Door walking," according to Giddens, refers to the practice of walking around town, checking on stores, and making sure the doors are locked.

informant Sanders considered reliable had implicated Plaintiff in soliciting protection money from drug dealers.

Plaintiff seems to argue that Defendants have not met their burden because at the time he was terminated, Giddens, the mayor, and the city council members refused to supply him with any reason for their decision other than to say that it was made "in the best interests of the City." Such an explanation is not clear or reasonably specific enough to meet the Defendants' burden, Plaintiff contends, and all the reasons Defendants now offer, he continues, should be disregarded as mere post-hoc rationalizations. That an employer's explanation for an employment action may have changed over time is relevant to the question of whether the reasons offered by the employer in litigation are pretextual, an issue the Court will subsequently address. Such does not, however, pertain to whether Defendants have met their intermediate burden at step two of the McDonnell Douglas framework. Federal laws prohibiting discrimination do not require employers to inform employees of the reasons behind their evaluations. See Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1499 (11th Cir. 1985). The instant question is merely whether Defendants have introduced evidence at this point in the litigation sufficient to indicate that they took the employment action in question for a clear, relatively specific, non-discriminatory reason. See id. Defendants have clearly done so, and any presumption of discrimination created by a prima facie showing drops from the case.

Thus, the inquiry proceeds to the final McDonnell Douglas phase, where the plaintiff is "afforded an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves, 120 S.Ct. at 1206 (quoting Burdine, 450 U.S. at 253). A plaintiff may do so by presenting evidence sufficient to indicate that a discriminatory reason more likely motivated the employer. See Burdine, 450 U.S. at 256. A plaintiff may also prevail at the pretext stage by demonstrating "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence." Standard, 161 F.3d at 1333 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)) (brackets in Standard). See also Reeves, 120 S.Ct. at 2108-09 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").[9]

The Court will assume that Plaintiff can show pretext with respect to one of the reasons now offered by Defendants for Plaintiff's firing: that Giddens was informed that Plaintiff would not be able to re-enter the police academy and thus could not be certified. Giddens stated at his deposition that he could not recall any other reasons for his recommendation other than the ones he provided. Giddens there explained that he recommended Plaintiff's firing based on the cumulative effect of a laundry list of incidents and procedure violations indicating to him that Plaintiff's job performance and attitude were deficient. Nowhere did Giddens suggest that he believed Plaintiff would not be able to re-enter the academy or that such motivated his termination recommendation, despite the fact that Giddens specifically discussed Plaintiff's lack of certification as it pertained to the duties he performed. Further, it is undisputed that when Plaintiff was fired, he had already been accepted and registered to attend the May 3, 1999, session of the Montgomery Police Academy and that it was only after Plaintiff's termination that Giddens, not APOSTC or academy officials, withdrew Plaintiff's name.

---

[9]There may be circumstances, however, where a showing that the employer's asserted justification is false may not support a judgment, such as "where the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred." Reeves, 120 S.Ct. at 2109. See also Chapman, 229 F.3d at 1025 & n.11.

However, in this circuit, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Chapman, 229 F.3d at 1024-25 (citing Combs, 106 F.3d at 1529). Plaintiff offers little to dispute the primary reason cited by Defendants as the justification for the termination decision: the cumulative effect of the multiple incidents and procedure violations that Giddens perceived as showing Plaintiff's deficient job performance and attitude. As to Giddens's claim that Plaintiff's paperwork was lacking, Plaintiff disputes this and alleges that he was never counseled about it. However, there is in the record a memo dated January 2, 1999 from Plaintiff's personnel file indicating that Giddens spoke with Plaintiff about improperly failing to swear to certain paperwork, but that since such had not been a problem before, "the first one was free." When an employer produces negative performance reviews, an employee's assertion of his own good performance is generally insufficient to defeat summary judgment. See Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997). In addition, Plaintiff fails to undermine the numerous other things cited by Giddens as indications of Plaintiff's deficient performance and attitude. Plaintiff indicates that he is willing to assume that he may have put some greater amount of time on his timecard than he actually worked. He is also willing to assume that he took down and replaced the "door walking" schedule posted by Giddens, because, as he allegedly told Giddens, "his was better." Plaintiff admits that without authorization he left his assigned duty to work security at the basketball game in February 1999 and that by so doing he disobeyed Giddens's orders. Plaintiff also does not contest either that he was riding on patrol some two to four hours before the start of his scheduled shift on April 1, 1999, or that such action was against policy and potentially increased the City's liability exposure, as he was told at the time. Plaintiff further admits that he was having a relationship with a woman who was not yet divorced, although she was, he offers, separated from her

husband at the time. And while Plaintiff denies that he was guilty of extorting money from drug dealers, he offers nothing to controvert Giddens's claim that he received information from Sanders that might have caused Giddens reasonably to suspect that Plaintiff was engaged in such illegal activity.

In response to these specific assumed or admitted occurrences, Plaintiff argues that he was not fired for them because there was some gap between the time of their occurrence and his eventual discharge. However, this argument misconstrues the level of generality of the legitimate reason cited for terminating Plaintiff. Defendants do not allege that Plaintiff was fired for any one of these incidents alone, but rather because their cumulative effect suggested to Giddens that Plaintiff's performance and attitude were such that his probationary employment should not be continued. Thus, Plaintiff's arguments miss the mark to the extent that they urge that none of the individual examples alone motivated Defendants. See Bogle, 162 F.3d at 658 & n.5; Combs, 106 F.3d at 1534-35.

Plaintiff also alleges that other employees engaged in similar or worse misconduct but were treated more favorably. Such evidence would, of course, be relevant to show pretext, particularly where the other employees are outside the plaintiff's protected classification. See, e.g., McDonnell Douglas, 411 U.S. at 804, ("Especially relevant to such a showing [of pretext] would be evidence that white employees involved in acts against petitioner of comparable seriousness . . . were nevertheless retained or rehired."). However, numerous courts have recognized that in order to be probative of a decisionmaker's intent in a pretext analysis, other employees used for comparison must be similarly situated to the plaintiff. See, e.g., Essex v. United Parcel Service, Inc., 111 F.3d 1304, 1311 (7th Cir. 1997); Griffin v. Super Valu, 218 F.3d 869, 871 (8th Cir. 2000); Smith v. Leggett Wire Co., 220 F.3d 752, 762 (6th Cir. 2000); Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1232 (10th Cir. 2000); Hargett v. National Westminster Bank, USA, 78 F.3d 836, 839 (2nd Cir. 1996) Cf. Holifield, 115 F.3d at 1562 (explaining that, at

the prima facie stage, "[t]o make a comparison of the Plaintiffs's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects"); Morrison v. Booth, 763 F.2d 1366, 1373 (11th Cir. 1985) (indicating that, at the prima facie stage, a plaintiff must establish that employees are "similarly situated" to him "so as to make his treatment relevant to them."). In order to be considered "similarly situated," the employees must have been involved in or accused of the same or similar misconduct, Holifield, 115 F.3d at 1562, dealt with the same decisionmaking supervisor, see Jones v. Bessemer Carraway Medical Center, 137 F.3d 1306, 1312 n.7 (11th Cir.), opinion superseded in other part on denial of reh'g, 151 F.3d 1321 (11th Cir. 1998), and operated under the same workplace rules or policies. See Lathem v. Department of Children and Youth Services, 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry [into whether employees are 'similarly situated'] is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies.").

An examination of the evidence demonstrates that Plaintiff's would-be comparators are not similarly situated to him. For example, Plaintiff claims that two white officers reported to work early and received no discipline while Giddens verbally reprimanded him and told him to go home until his shift began. However, the record indicates that these officers merely came to work about twenty minutes early and completed paperwork at the station. Such is manifestly different from Plaintiff's admitted conduct, where he went out in the streets on patrol some two to four hours before the start of his shift. Plaintiff similarly alleges that Giddens took statements about his allegedly adulterous affair while off duty and yet did not similarly investigate more serious alleged conduct of officer Siggers. Plaintiff contends that the woman he was then dating was in the process of getting divorced, was separated from her husband, is now Plaintiff's fiancee. Giddens, Plaintiff points out, had heard that Siggers would take young women to the park while

he was on duty and have sex with them. Giddens admitted that he did not take any statements with regard to Siggers's alleged misconduct, but he said that much of it had allegedly occurred before he had become chief and his knowledge of it was based only on rumor. In Plaintiff's case, by contrast, Giddens had a specific citizen complaint from the woman's husband, who claimed Plaintiff was having sex with his wife. Furthermore, Plaintiff offers no evidence that another employee had the accumulation of incidents similar to his, which was, as the Court has noted, the reason articulated for his discharge. See Early v. Aerospace Corp., 139 F.3d 888 (table), 1998 WL 80142, **1 (4th Cir. 1998) ("Although Early alleges that others engaged in similar conduct and possessed similar deficiencies and were not disciplined, he points to no other employee with a cumulative comparable history of employment problems."). In particular, Plaintiff has not suggested that any other probationary employees experienced problems similar to his who were not disciplined or discharged.

Next, Plaintiff emphasizes that despite the fact that he asked Giddens and the city council numerous times immediately after he was fired what the basis was for their decision, they refused to answer other than to give the vague response that the action was taken "in the best interest of the city." Where an employer gives one justification for an adverse employment decision at the time the decision is made and then gives a different reason only after an allegation of discrimination is raised, such is evidence tending to suggest that the employer may have simply conjured up the later reason after the fact to hide an unlawful motivation. See, e.g., Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 634 (7th Cir. 1996); E.E.O.C. v. Ethan Allen, Inc., 44 F.3d 116, 120 (2nd Cir. 1994). DeMarco v. Holy Cross High School, 4 F.3d 166, 171 (2nd Cir. 1993) ("The pretext inquiry thus normally focuses upon factual questions such as whether . . . the putative non-discriminatory purpose was stated only after the allegation of discrimination"). However, the fact that a specific explanation is not articulated contemporaneously with

an employment decision does not necessarily create an issue of material fact as whether reasons later proffered are pretextual.  See Conner, 761 F.2d at 1499 ("Failure to explain decisions to employees may prove bad management but it does not necessarily prove discrimination"); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1215-16 (3rd Cir. 1988) ("Post hoc explanations, like any self-helpful statement made after the initiation of a lawsuit, may be to some degree suspect. However, the mere fact that a defendant relies on a post hoc evaluation does not in and of itself create a factual dispute about whether the evaluation is pretextual.").  See also Standard, 161 F.3d at 1332-33 (holding that where evidence indicated that, in response to an EEOC investigation initiated by the plaintiff's charge, the decisionmaker completed worksheets indicating reasons for adverse action taken against Plaintiff and then back dated the sheets to the time of the actual evaluation process, such was insufficient to show those reasons were pretextual; while the back dating could be seen as evidence that the reasons listed on the worksheets were made up after the decision was made, the plaintiff failed to dispute the truth of virtually all of the evaluations listed on the worksheets).

Given the fact that Plaintiff is unable to dispute the truth of the bulk of the reasons offered by Defendants as contributing to their perception that Plaintiff's poor performance, as a probationary employee, warranted his termination, the Court concludes that Defendants' failure to reveal their reasons at the time of the employment decision does not preclude the entry of summary judgment. See id. In addition, Giddens indicated that he and members of the city council were advised by an attorney for the City not to provide any more specific reason for the decision to terminate Plaintiff's employment.  Such advice may not be entirely wise given its potential to engender suspicion, as well as creating evidence that reasons offered in a subsequent suit are pretextual, as already explained.  However, reliance upon such legal advice, and Plaintiff has presented nothing to suggest that it was not given as Giddens claims, would seem to

undercut Plaintiff's assertion that Defendants' did not have any other legitimate reasons for the decision at the time it was made.

Plaintiff has also offered evidence that has at least some tendency to suggest that Giddens has some level of generalized racial bias. Plaintiff has presented Giddens's deposition testimony in which he admitted using a racial slur. See Jones, 151 F.3d 1321, 1323 n.11 ("Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case."). He has also suggested that Giddens treated him in a rude manner, while not doing so with white officers. See Reeves, 120 S.Ct. at 2111 (citing supervisor's different treatment toward older and younger employees as evidence of pretext in suit alleging age discrimination). However, the Court concludes that this evidence is clearly insufficient to indicate that a discriminatory reason more likely motivated the termination decision, given that the slur in question was uttered years before Giddens even became Lineville's chief of police and in a context wholly unrelated to Plaintiff or to employment issues, and that the alleged rude behavior, even if believed, is wholly ambiguous. "[I]t is well settled that 'stray remarks' alone will not overcome overwhelming evidence corroborating defendants' non-discriminatory rationale." Sreeram v. Louisiana State University Medical Center-Shreveport, 188 F.3d 314, 320 (5th Cir. 1999) (citing Brown v. CSC Logic, Inc., 82 F.3d 651 (5th Cir. 1996). Accord Simmons v. Oce-USA, Inc., 174 F.3d 913, 916 (8th Cir. 1999). In addition, the evidence shows that the same persons were involved in the decisions to hire and fire Plaintiff. While evidence of such circumstances does not in this circuit create any presumption that the firing decision was non-discriminatory, it does tend to support that fact. See Williams v. Vitro Services Corp., 144 F.3d 1438, 1443 (11th Cir. 1998). Moreover, that inference is even stronger where, as here, the firing decision is made a short period of time after the hiring decision. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137-38 (2nd Cir. 2000). Based on the foregoing, the Court concludes

that Plaintiff has failed to present sufficient evidence of pretext and that Defendants are entitled to summary judgment on Plaintiff's Title VII and equal protection claims alleging that he was terminated because of race.

### b. Radio Dispatcher Assignments

Plaintiff has also alleged in his complaint that he might recover under Title VII and/or section 1983 based on allegations that Giddens assigned him less desirable radio dispatcher duty more often than similarly situated white officers. It is well established that making work assignments along the lines of race or sex is forbidden under Title VII. See Ferrill v. The Parker Group, Inc., 168 F.3d 468, 471-72 (11th Cir. 1999) (section 1981 violated by telephone marketer's practice of "race-matching" its employees to targeted survey respondents); Eubanks v. Pickens-Bond Const. Co., 635 F.2d 1341, 1345 (8th Cir. 1980) (affirming district court's finding of disparate treatment based on evidence that black cement finishers were assigned more undesirable tasks than similarly situated whites); Smith v. Texas Dep't of Water Resources, 799 F.2d 1026, 1030 (5th Cir. 1986) (female plaintiff made out a prima facie case of discrimination based on allegations that she, but not her male counterparts, was ordered to relieve her supervisor's secretary on a daily basis). Indeed, an employer may be found to violate Title VII even if the racially discriminatory assignment of jobs does not translate into economic loss. See Swint v. Pullman-Standard, 539 F.2d 77, 89-90 (5th Cir. 1976). In order to make a prima facie case of discrimination on such a claim, a plaintiff must present sufficient evidence to show that he was treated differently than were similarly situated white officers with respect to job assignments. See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1344 (11th Cir. 2000).

The Court will again assume that Plaintiff can make out a prima facie case on this claim. Plaintiff has presented evidence tending to indicate that dispatcher duties were considered less desirable than regular street patrol. He has identified two uncertified white officers, Derrick Forbes and Tony Knight, who, he claims were assigned dispatcher

duties far less often than he was, during the period shortly after he returned from attempting to successfully complete the police academy in December 1998. Indeed, Defendants' own evidence would seem to confirm that, of the twelve times between December 10, 1998 and February 14, 1999, that an officer was scheduled to work dispatch, Plaintiff drew the assignment eleven times, with Knight drawing it the other time. See Defendants' Exh. 11. Moreover, Giddens admitted at his deposition that he scheduled Plaintiff to work dispatcher duties more often during that period. However, Plaintiff fails to offer sufficient evidence to cast doubt on the legitimate, non-discriminatory reason offered by Giddens as the reason for those assignments: that Plaintiff had sprained his ankle while attending the academy, and Giddens wanted to allow Plaintiff adequate time to heal and did not want to risk Plaintiff's re-injury. While Plaintiff contends that he was physically able to perform street patrol after he returned from the academy, he does not dispute that his ankle injury was serious enough to put him on crutches and require prescribed pain medication for several days and force his withdrawal from the academy. Further, the same schedule confirming Plaintiff's repeated dispatcher duty assignments from mid-December 1998 to February 14, 1999, indicates that of the nine dispatcher shifts assigned to uncertified officers from February 15, 1999 to Plaintiff's termination on April 9, 1999, Plaintiff was assigned only one, with the rest going to Forbes. The Court concludes that Defendants are entitled to summary judgment on these claims.

### c. Verbal Reprimands

Finally, Plaintiff alleges that he was subjected to race discrimination based on verbal reprimands he received from Giddens. He cites the time Giddens dressed him down in the municipal courtroom in February 1999 for leaving his post at the basketball game and the time he was told to go home when he arrived for his shift several hours early on April 1, 1999. However, "not everything that makes an employee unhappy is an actionable adverse action" for purposes of federal discrimination law. Doe v. Dekalb

County School Dist., 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996). An employee may recover where an employer, because of a protected characteristic, takes an adverse, tangible job action that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Alternately, an employee may attempt to prove a Title VII or Equal Protection Clause violation by proving that he has been subjected to a hostile work environment because of race, based on harassment that is sufficiently severe or pervasive enough to alter the terms and conditions of his employment. See Watkins v. Bowden, 105 F.3d 1344, 1355 (11th Cir. 1997); Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971).

Here, the Court has already concluded that Plaintiff cannot prevail on his claims alleging discriminatory discharge or discriminatory work assignments. Those qualified as adverse employment actions. But the verbal reprimands Plaintiff allegedly received from Giddens for what amount to admitted policy violations do not, in and of themselves, similarly qualify. See Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1283-84 (11th Cir. 1999) (memorandum expressing concern with the plaintiff's absences and warned of possible ramifications did not show an adverse employment action.) See also Mistretta v. Volusia County Dept. of Corrections, 61 F.Supp. 2d 1255, 1261 (M.D. Fla. 1999) (mere verbal criticism of an employee's work is not adverse employment action). Nor has Plaintiff alleged harassment nearly severe or pervasive enough to be actionable. See Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir. 1999) (en banc) (sexual harassment). Moreover, Plaintiff has failed to point to evidence of another employee who went on patrol several hours before his shift began or that Giddens was aware that another employee left his post as Plaintiff did at the basketball game. Thus, even if the verbal reprimands were actionable, Plaintiff has failed to cite evidence of more favorable

treatment afforded white employees. The Court concludes that Defendants are entitled to summary judgment on these claims as well.

## B. MOTIONS TO STRIKE AND FOR SANCTIONS

As previously discussed, in support of their motion for summary judgment, Defendants asserted that Giddens received a telephone call from Sanders potentially implicating Plaintiff in extorting protection money from drug dealers, and that such information played a role in his recommendation that Plaintiff should not be retained. To corroborate that such a call occurred, Defendants included in their evidentiary submission Sanders's affidavit. Defendants' Exh. 21. Plaintiff, however, has moved to strike the affidavit, on the grounds that Defendants allegedly failed to timely disclose Sanders as a potential witness and because the affidavit allegedly contains inadmissible hearsay. See Doc. No. 62.

Plaintiff has also filed a similar motion for sanctions under Fed. R. Civ. P. 37(c), based on alleged violations of Fed. R. Civ. P. 26, namely: Defendants' alleged failure to timely disclose Sanders as a potential witness and Defendants failure to produce Giddens's handwritten notes pertaining to his conversation with Sanders.[10] See Doc. No. 67. It

---

[10]Fed. R. Civ. P. 26 provides, in relevant part:
(a) Required Disclosures; Methods to Discover Additional Matter.
       (1) Initial Disclosures. Except to the extent otherwise stipulated or directed by order or local rule, a party shall, without awaiting a discovery request, provide to other parties:
          (A) the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings, identifying the subjects of the information;
          B) a copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings;
. . . .
(e) Supplementation of Disclosures and Responses. A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter

should be noted that while the notes in question were not provided to Plaintiff before the close of discovery, they are also not before the Court for purposes of Defendants' motion for summary judgment, because Defendants did not timely file them with their dispositive motion, as required by the Court's Rule 16(b) order.    See Doc. No. 18 at 3 ("Simultaneously with the filing of the motion, any and all evidence . . . in support of the dispositive motion must be filed in the Clerk's Office . . . .") (emphasis omitted).    For Defendants' alleged discovery violations, Plaintiff requests that the Court impose the following sanctions: (1) order Defendants to pay expenses and attorney fees incurred by the failure to produce the notes and identify Sanders; (2) prevent Defendants from using Sanders's affidavit or the notes at trial or on any motion; (3) deny Defendants' pending motion for summary judgment; (4) inform the jury at trial of Defendants' failure to disclose Sanders as a potential witness or produce the notes; and (5) impose any other sanction the Court deems appropriate.    The Court concludes that both motions are due to be denied in their entirety.    However, even if the Court were to exclude from consideration both Sanders's affidavit and Giddens's notes, it would not make any difference whatsoever in the Court's decision that summary judgment for Defendants is warranted on all remaining claims.

The Court will first address the argument in Plaintiff's motion to strike that Sanders's affidavit is due to be excluded on hearsay grounds, as argued by Plaintiff's

---

acquired if ordered by the court or in the following circumstances:

> (1) A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due.

motion to strike. As explained previously, inadmissible hearsay generally cannot be considered on a motion for summary judgment, and Fed. R. Civ. P. 56(e) requires that "affidavits" that support or oppose summary judgment motions "shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." Macuba, 193 F.3d at 1322. Sanders's affidavit is not offered, contrary to Plaintiff's assertion, to prove that Plaintiff did, in fact, solicit or receive protection money from drug dealers. It is offered, rather, for the non-hearsay purpose of corroborating Giddens's claim that he received the call from Sanders alleging that Plaintiff had engaged in the subject illegal conduct. Sanders would have personal knowledge that he received information from the confidential source and that he related the information to Giddens. Thus, the affidavit is not inadmissible on these grounds.

Next, the Court considers the question of sanctions, including whether the affidavit of Sanders is due to be excluded, for alleged discovery violations, pursuant to Fed. R. Civ. P. 37(c). Under that rule, "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence . . . on a motion any witness . . . not so disclosed." Fed. R. Civ. P. 37(c)(1). Rule 37(c)'s "sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." Salgado v. General Motors Corporation, 150 F.3d 735, 742, (7th Cir.1998). See also Burney v. Rheem Mfg. Co., Inc., 196 F.R.D. 659, 691 (M.D. Ala. 2000). In considering whether the exclusion of evidence is an appropriate sanction for failure to comply with discovery duties, we must consider four factors: (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or wilfulness in failing to comply with a court order or discovery obligation. Nicholas v.

Pennsylvania State University, 227 F.3d 133, 148 (3rd Cir. 2000); Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999).  See also United States v. $9,041,598.68 (Nine Million Forty One Thousand Five Hundred Ninety Eight Dollars and Sixty Eight Cents), 163 F.3d 238, 252 (5th Cir. 1998) (reciting a similar list of factors).  "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." Mid- America Tablewares, Inc. v. Mogi Trading Co., 100 F.3d 1353, 1363 (7th Cir. 1996).

Under Rule 26, Defendants were required to both list Sanders as a potential witness in their disclosures and to produce the notes of Giddens related to his telephone call from Sanders.  The Court concludes, however, that Defendants are not due to be sanctioned under Fed. R. Civ. P. 37(c), because the Defendants' failures were harmless.  Plaintiff's counsel clearly knew of Sanders' role in the case before the October 10, 2000 discovery deadline, notwithstanding Defendants' failure to formally list him as a witness.  In their June 29, 2000 answers to Plaintiff's interrogatories, Defendants stated that they fired Plaintiff based in part on a call from the DEA which adversely reflected on Plaintiff's ability to be a police officer.  On June 9, 2000, Defense counsel asked Plaintiff at his deposition whether he knew anyone named "Randall Sanders," to which Plaintiff responded negatively.  But most significantly, on October 5, 2000, Giddens clearly explained that part of his decision to terminate Plaintiff was based on a call from Randall Sanders in late March 1999, in which Sanders had stated to him that an informant Sanders considered reliable, based on other information provided, had claimed that a Lineville officer named "Ervin" was extorting money from drug dealers.  Plaintiff's counsel explored the recollections of and beliefs formed by Giddens as a result of the call at some length, see Plaintiff's Depo. at 59-63.  Defendants allege that their failure to list Sanders and produce the notes was merely inadvertent, and Plaintiff has not shown bad faith. Moreover, Sanders's affidavit merely corroborates the assertions made by Giddens with

respect to both receiving a call from Sanders and the substance of that call. The only relevant issue that Plaintiff's counsel could have possibly further explored was Sanders's version of what he told Giddens,[11] but Plaintiff's counsel never sought to depose him. In any event, with or without the affidavit of Sanders, there is no evidence in the record undermining the allegations of Giddens as to what he was told, so summary judgment is due to be granted regardless of whether the affidavit is considered. The notes of Giddens were not before the Court for purposes of summary judgment, and Plaintiff has given no indication how he might have exploited them had they been produced to him in a timely fashion, as they too merely corroborate the deposition testimony of Giddens. The Court concludes that Plaintiff's motion to strike and motion for sanctions are due to be denied.

## IV. CONCLUSION

Based on the foregoing, the Court concludes that Plaintiff's motion to exclude the affidavit of Randall Sanders, Doc. No. 62, is due to be DENIED. Plaintiff's motion for sanctions, Doc. No. 67, is likewise due to be DENIED, because Defendants' discovery violations were harmless. And finally, the Court concludes that Defendants' motion for summary judgment, Doc. No. 59, is due to be granted, as the Court has determined

---

[11]Plaintiff cannot claim that he needed to know about Sanders because he might have further investigated the basis and reliability of the information Sanders passed on to Giddens, so that Plaintiff might have better shown that he did not engage in the illegal activity supposedly alleged by the confidential informant. The issue here is not whether Plaintiff did or did not actually engage in the misconduct. The issues, rather, concern what Giddens honestly believed about the allegations based on what he was told by Sanders, his only source of information on the topic, and whether such played a role in the employment decision. "Evidence showing a false factual predicate underlying the employer's proffered reason does not unequivocally prove that the employer did not rely on the reason in making the employment decision. Instead, it may merely indicate that the employer, acting in good faith, made the disputed employment decision on the basis of erroneous information. Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991)." Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J., concurring specially) (further citation omitted). "[E]stablishing pretext is not merely demonstrating that the employer made a mistake [in its assessment of an employee's job performance or conduct], but that the employer did not give an honest account of its behavior." Id. (Footnote omitted).

there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on all remaining claims.  A separate order will be entered.

DONE this _12th_ day of December, 2000.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE